## Case No. 5,096.

### FRENCH v. BREWER.

[3 Wall. Jr. 346;[1] 18 Leg. Int. 324; 9 Pittsb. Leg. J. 153.]

Circuit Court, W. D. Pennsylvania. Nov. Term, 1861.

---

[1] [Reported by John William Wallace, Esq., and here reprinted by permission.]

Mr. Church, for complainants,

McCalmont & Kerr, for respondents,

·GRIER, Circuit Justice. The instrument on which this controversy arises is anomalous in character. It is the work of a conveyancer ignorant of legal forms, and wholly unlearned in the law. It does not profess to sell or convey absolutely all the mines of paint or petroleum lying in or under the 160 acres. If it had done so, the title to the minerals would necessarily include a right to enter on the land of the grantor to take them away. A lease for years is a contract for the use of lands or tenements; and although it may be for a full consideration paid down, and reserve no rent to be paid in future, yet it contemplates a temporary use of the thing leased, whether it be a farm or a mine, and a return of the possession thereof to the owner or reversioner. Suppose it was a lease for one year to "take at all times so much of the oil as is consistent with his pleasure or interest," would this confer an absolute title to all the oil, whether taken within the year or not? The great and governing rule in the construction of all contracts or deeds is to ascertain the intention of the parties, and this must be by a careful examination of the whole instrument. This is more especially necessary in a country where every man is his own scrivener, and freely uses legal terms without a knowledge of their true or precise legal import. It is no doubt a just rule of construction, that restrictive words, repugnant to an absolute grant or

sale of a thing, may be construed to be inoperative, because they contradict the clearly expressed terms of the deed, as to the nature and extent of the estate granted, and render it ineffectual for the purpose clearly intended by the parties. But we must first examine the whole instrument, all its parts, and each provision or covenant contained in it, to ascertain the intention of the parties, before this rule can apply. We should ascertain the nature of the thing which is the subject of the grant, and the state of knowledge of the parties. The rules of construction adopted with regard to leases or conveyances of coal mines or other solid mineral substances, may have little application to this newly discovered mineral liquid. There would be no necessary contradiction in the terms of a lease of coal mines, that the lessee might take all the coal, or so much as he pleased, under a tract of 100 acres, while it prohibited his entry on all but 10 acres for the purpose of sinking the shafts for his mines. It may be true that wells sunk on the 105 acres or on the island, might or might not drain the oil from the whole 160 acres. As to this fact, the parties have furnished no evidence whatever, and it is probably a fact not yet ascertained or known. We must have reference, in interpreting this obscure paper, to the state of knowledge of the parties, and of the whole country, with regard to the subject matter of this contract, and the mode in which this mineral oil was obtained. When the instrument was executed, the only method known by which the oil could be obtained, was by digging trenches, and raising the oil by blankets from the water. The natural flow of the creek would carry the oil on its surface from the lands of the respondents to those of the complainants, which were lower down; unless the oil was arrested above. That part of the 160 acres called the island was conveniently situated for making the trenches to gather the oil as it came down. Recalling, as the reporter's statement gives it to us, and as the affidavits disclosed it, the knowledge of the parties and the people on the subject of this contract, and the fact that till the time of Drake's discovery the oil had found its way to the surface through chance fissures in the strata under the stream, and that it was not till 1858 that boring to find the source of the oil was practised—much of the difficulty in the construction of this instrument, by reason of apparent contradiction in its covenants, vanishes.

It is not necessary, however, nor perhaps proper to express any conclusive opinion as to the construction and effect of this instrument before the final hearing. It is sufficient, for the purpose of the present motion, to say:

1. That it is, at least, doubtful whether the complainant's deed conveys in absolute estate all the oil under the respondent's lands, or only a license for a term of years to collect what flowed on the surface of Oil creek; or whether parties could be said to contract about a subject matter of which both were wholly ignorant. Caldwell v. Fulton, 7 Casey [31 Pa. St.] 479, cited by Mr. Church, has no similarity to the present. It is no doubt true, that minerals beneath the surface may be conveyed as corporeal hereditaments, and thus severed in title from the surface soil; and there is no doubt that livery of seizin is unnecessary either here or in England since the statute of uses and the introduction of deeds of bargain and sale. But it might nevertheless be a sufficient reason for construing an instrument to take effect as a grant of an incorporeal hereditament, which requires no livery of seizin, that it contains no apt technical words to grant, bargain or sell absolutely a corporeal hereditament, or an unsevered portion of the grantor's land.

Since that decision, a court, administering the law of Pennsylvania, might be justified in construing a grant of "the full right, title and privilege of digging and taking away stone coal to any extent" from the land of the grantor, as an absolute bargain and sale of the coal to the grantee. But we must construe the deed before us ex visceribus suis; having reference to the peculiar nature of the subject matter and the knowledge of the parties with regard to it. With these facts in view it is at least doubtful whether the parties intended by this anomalous instrument to grant anything more than a license for a term of years to take all of the oil floating down the creek, and to use the island for that purpose, in consideration of the grantee's license to them to have a mill race over their land. A final decision of this question must be reserved till a final hearing of the case.

2. There is no evidence to support the charge of the bill, that wells bored by the respondents prevent the oil from flowing down the creek, or that they have interfered in any way to arrest such flow or hinder the enjoyment of any of the complainants' right on the island. We do not know, and are not informed by the pleadings or evidence, that the oil taken from the rocks above would ever have flowed (above or below the surface) down to the island, or to the one hundred and five acres below.

3. The oil taken by defendants thus far has not compensated the expense and trouble of boring the wells. An injunction now would compel the respondents to cease their business and discharge a large number of hands. It would inflict a certain injury on the respondents, while the benefit to the complainants, like their title, is uncertain. If they recover on final hearing, the new wells will be a benefit to them, and not an irreparable injury. Injunction refused.